**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 18-193 |
| DKYLE JAMAL BRIDGES,<br>KRISTIAN JONES | : | |
| | : | |

**GOVERNMENT'S OMNIBUS RESPONSE**
**IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

The United States of America, by and through William M. McSwain, United States Attorney for the Eastern District of Pennsylvania, Seth M. Schlessinger, Assistant United States Attorney for the District, and Jessica Urban, Trial Attorney, Department of Justice, hereby files this omnibus response to the defendants' motions to dismiss the indictment [DE 49, 54]; for a bill of particulars [DE 43, 47]; to suppress evidence [DE 55, 65]; to suppress identifications [DE 44]; and for a severance [DE 48, 50].   In opposition to the listed motions, the government states as follows, and respectfully requests that the motions be denied:

**I.   DISCUSSION**

**A.   *The Court Should Deny the Defendants' Motions to Dismiss the Indictment***

Defendants Bridges and Jones have each filed a motion to dismiss the indictment [DE 49, 54].   Although separately filed, the motions are virtually identical, effectively constituting a single joint motion to dismiss.   Together, the motions allege that the indictment fails to comply with Fed. R. Crim. P. 7(c), and further that the indictment violates the defendants' Fifth and Sixth Amendment rights.   The defendants are incorrect.

The indictment charges the defendants in Count One with conspiring to engage in the sex trafficking of minors and in forcible sex trafficking, in violation of 18 U.S.C. § 1594(c).   The indictment further charges each defendant with additional substantive counts of sex trafficking, each pertaining to a particular victim:   Counts Two and Three charge Bridges with the forcible sex trafficking of victims Z.W. and J.S., respectively, in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1).   Counts Four, Five and Six charge both Bridges and Jones with the forcible sex trafficking of minor victims B.T., N.G., and L.C., respectively, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), and (b)(2).   In alleging each of the offenses, the indictment substantially tracks the language of the statute defining the charged offense, provides a time frame during which the offense conduct occurred and, as to each of the substantive counts, identifies (by initials only) the victim alleged to have been trafficked in that particular count.   See DE 1 (indictment).

Under the Federal Rules of Criminal Procedure, an indictment need only be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).   A facially sufficient indictment is one that "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution."   United States v. Vitillo, 490 F.3d 314, 320 (3d Cir. 2007); see also United States v. Manzo, 636 F.3d 56 (3d Cir. 2011).   An indictment is generally sufficient to satisfy these criteria if it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred.   See United States v. Huet, 665 F.3d 588, 595 (3d Cir. 2012); United States v. Urban, 404 F.3d 754, 771 (3d Cir. 2005).

2

The Third Circuit has repeatedly held that an indictment which recites the statutory language defining the offense being charged is sufficient. "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation" to permit a defendant to prepare his defense and invoke double jeopardy. United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007) (quoting United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989)). "The specificity required for an indictment to have sufficient factual orientation to permit a defendant to prepare his defense and invoke double jeopardy, is not particularly onerous." United States v. John-Baptiste, 747 F.3d 186, 196 (3d Cir. 2014). "[A] defendant has sufficient notice to guard against a future prosecution in violation of the protection against double jeopardy if an indictment specifies the time frame for the criminal conduct." Id. "In short, detailed allegations are unnecessary." United States v. Stock, 726 F.3d 287, 292 (3d Cir. 2013) (internal quotation omitted).

The Third Circuit has frequently observed and adhered to these straightforward principles. See, e.g., John-Baptiste, 747 F.3d 186, 196 (3d Cir. 2014); Huet, 665 F.3d at 595; United States v. Bergrin, 650 F.3d 257, 264 (3d Cir. 2011); United States v. Saybolt, 577 F.3d 195, 205 (3d Cir. 2009). District courts, including in this District, have routinely applied this analysis to reject arguments analogous to the defendants' claim that an indictment must include more than the statutory language to suffice under Rule 7. See, e.g., United States v. Totoro, Crim. No. 15-291, 2017 WL 3189216, at *2-3 (E.D. Pa. July 27, 2017) (finding indictment for child exploitation offenses sufficient when it tracked the language of the statutes, did not further specify the means the defendant had used, and identified the victims only generically); United States v. Frangos, Crim. No. 14-242, 2014 WL 4652473, at *4-5 (E.D. Pa. Sept. 18, 2014) (holding indictment for

harboring an alien sufficient where it tracked the language of the statute and specified the time period); United States v. Reyes, Crim. No. 06-654, 2013 WL 4042508, at *6 (E.D. Pa. Aug. 8, 2013) (rejecting defendant's argument that indictment failed to adequately allege Hobbs Act robbery, because indictment listed the elements of the violation as defined by statute and identified the time period during which the robbery occurred).   And significantly, district courts have specifically held that indictments charging sex trafficking offenses are sufficient where the indictment recites the relevant statutory language.   See, e.g., United States v. Ford, No. 3:14-cr-45, 2016 WL 4443171, at *15 (D. Ore. Aug. 22, 2016) (denying sex trafficking defendant's motion to dismiss indictment, because it was "sufficiently specific" where it "precisely track[ed] the statutory language"); United States v. Elbert, No. 06-cr-257-01, 2007 WL 107675, at *1-2 (W.D. Mo. Jan. 9, 2007) (finding sex trafficking counts sufficient where they "clearly track[ed] the language of 18 U.S.C. § 1591" and identified the approximate date and locale of the offense, the latter by district).

Application of these principles to the indictment in this matter reveals that the indictment is plainly sufficient.   As noted above, the indictment properly alleges all of the elements of the offenses charged.   As to the conspiracy in Count One, those elements are that two or more persons agreed with each other to commit sex trafficking of minors and through use of force; that the defendant was a party or member of that agreement; and that the defendant joined the agreement knowing of its objective and intending to achieve it.   See, e.g., 3rd Circuit Model Criminal Jury Instructions, 6.18.371A (2013) (describing elements for conspiracy under 18 U.S.C. § 371); United States v. Shabani, 513 U.S. 10, 11 (1994) ("[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms.   We have consistently held that the

4

common law understanding of conspiracy does not make the doing of any act other than the act of conspiring a condition of liability.") (citation omitted); United States v. Gibbs, 190 F.3d 188, 197 & n.2 (3d Cir. 1999) (describing proof required to establish a conspiracy generally, as well as lack of any overt-act requirement in 21 U.S.C. § 846) (citing Shabani, 513 U.S. at 11).    As to the substantive counts of sex trafficking charged in Counts Two through Six, those elements are that the defendant knowingly recruited, enticed, harbored, transported, provided, obtained or maintained a person; that the defendant acted knowing or in reckless disregard of the fact that means or threats of force would be used to cause that person to engage in a commercial sex act (or, as to Counts Four, Five and Six, knowing or in reckless disregard of the fact that the person was under the age of eighteen and would be caused to engage in a commercial sex act, or having had a reasonable opportunity to observe the person); and that the defendant's actions were in or affecting interstate or foreign commerce.    See, e.g., United States v. Williams, 666 F. App'x 186, 193, 195-98 (3d Cir. 2016); United States v. Afyare, 632 F. App'x 272, 275-79 (6th Cir. 2016); United States v. Chapman, 589 F. App'x 159, 160 (4th Cir. 2015); United States v. Rivera, 558 F. App'x 971, 974 (11th Cir. 2014); United States v. Campbell, 764 F.3d 880, 889-92 (8th Cir. 2014); United States v. Flanders, 752 F.3d 1317, 1330 (11th Cir. 2014); United States v. Garcia-Gonzalez, 714 F.3d 306, 312 (5th Cir. 2013).

Each of those elements is expressly alleged in the pending indictment.    Moreover, as to each alleged offense, the indictment alleges a time frame and a location where the offense is alleged to have occurred.    Finally, each substantive count notifies the defendant of the particular victim to which the count pertains.    No greater specificity is required, either by Rule 7(c) or by the Fifth or Sixth Amendment to the Constitution, and the defendants' complaints that they are

"left wondering" how they are alleged to have committed the offenses charged are wholly unconvincing.   DE 49 at 10, DE 54 at 11.   Moreover, the defendants' claims are in certain aspects simply factually inaccurate – particularly that the conspiracy count "fails to identify any alleged coconspirators," DE 49 at 10, DE 54 at 11, since the indictment plainly names Bridges and Jones, in addition to other persons not specified,[1] as each other's co-conspirators.   Also flatly wrong is the defendants' claim that "[t]he Indictment's bald allegations do not apportion any conduct to any specific defendant."   DE 49 at 10, DE 54 at 11.   On the contrary, the indictment specifically charges both defendants with conspiracy to engage in sex trafficking, but Bridges alone with engaging in the substantive sex trafficking of five separate victims, while Jones is charged with the substantive sex trafficking of only three of those five victims.   The allegations are thus clearly and explicitly apportioned as to each defendant.

Notably, the extensive authority cited above, establishing that use of the statutory language itself sufficiently alleges an offense under Rule 7(c), postdates the sole binding authority on which the defendants' motions rely, Gov't of the Virgin Islands v. Pemberton, 813 F.2d 626 (3d Cir. 1987).   There, the Third Circuit found inadequate an information charging a burglary in violation of Virgin Islands law that failed to specify the offense that the defendant was alleged to have intended to commit after unlawfully entering the residence.   Id. at 632.   The Third Circuit has not extended the holding of Pemberton beyond the context of burglaries charged under Virgin Islands law, and Pemberton is in any case plainly inapplicable.   The Third Circuit's decision in Pemberton rested on its observation that burglary was a specific intent crime, in that to commit a burglary a

---

[1] It is the standard policy of the Department of Justice not to name unindicted co-conspirators.

person unlawfully entering a residence must intend to commit a crime after entering, and the Third Circuit had long held that "an indictment charging violation of a statute requiring specific intent to commit another offense must allege that intent with particularity."   Id. at 631.   By contrast, there is no such specific intent requirement contained in either the § 1594(c) conspiracy offense or the substantive § 1591(a)(1) offenses charged in the instant indictment.   Moreover, the defective information in Pemberton left open the possibility that the defendant who committed the burglary intended to commit any offense whatsoever upon the unlawful entry – effectively leaving a gap that could have been filled by any offense in the entirety of the Virgin Islands criminal code. There is no analogous open-ended gap in the pending indictment in this case; rather, the conduct alleged is bounded by the statutory language, whose plain and natural meanings provide more than sufficient notice of the conduct that is alleged.   Pemberton is inapt, and the motions to dismiss the indictment should be denied.

### B.  The Court Should Deny the Defendants' Motions for Bill of Particulars

The defendants have each filed a motion for a bill of particulars, which, like the motions to dismiss the indictment, are substantially identical.   See DE 43 (motion of defendant Jones), DE 47 (motion of defendant Bridges).    The motions lack merit and should be denied.

Fed. R. Crim. P. 7(f) permits a court to direct the government to file a bill of particulars. "The purpose of [such a] bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense."   United States v. Moyer, 674 F.3d 192, 203 (3d Cir. 2012).   Rule 7(f) is not, however, intended to serve as a discovery device.   See United States v. Bloom, 78 F.R.D. 591, 600 (E.D. Pa. 1977) (noting that

"the Courts in [the Third Circuit] have consistently held that a bill of particulars is not a device for discovery, nor can it be used to seek information protected by the Jencks Act," and citing United States v. Conway, 415 F.2d 158 (3d Cir. 1969)).    It has long been "firmly established, for example, that a defendant is entitled neither to a wholesale discovery of the Government's evidence, nor to a list of the Government's prospective witnesses."    United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1971) (citations omitted).    The government is not required to, "at the pre-trial stage, weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendants."    Id.

    The defendants' motions request bills of particulars not only with respect to the substantive sex trafficking counts, but also as to the count charging a sex trafficking conspiracy.    The Third Circuit has expressly stated that a defendant is not entitled to a bill of particulars that provides the "'when, where and how' of any overt acts not alleged in the indictment."    United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1975).    It explained that such a request was "tantamount to a request for wholesale discovery of the Government's evidence, which is not the purpose of a bill of particulars under Fed. R. Crim. P. 7(f)."    Id. (citation omitted).    Accordingly, it held that a conspiracy count charging that the defendant and his co-defendants "did combine, conspire, confederate and agree together, with each other, and with divers[e] other persons whose names are to the Grand Jury, known and unknown, to distribute heroin . . . " was sufficient, and did not entitle the defendants to a bill of particulars under Rule 7(f).    Id. at 55.    Plainly, under Armocida, the indictment in the instant case is drafted with sufficient specificity to defeat the defendants' claimed entitlement to a bill of particulars.

Moreover, the Third Circuit has recognized that a bill of particulars is not warranted when sufficient discovery has been provided to the defendants to apprise the defendants of the specific details of the offenses charged and the nature of the evidence thereof, and to permit the defendants to prepare a defense.   See Urban, 404 F.3d at 772; see also, e.g., United States v. Summers, 593 F. App'x 157, 159 (3d Cir. 2014) ("Moreover, Summers' access to discovery prior to filing the motion provided ample information to allow Summers to prepare an effective trial strategy."); United States v. Kenny, 462 F.2d 1205 (3d Cir. 1975); Bloom, 78 F.R.D. at 600 (recognizing, as among the reasons that the defendants were not entitled to a bill of particulars, that the government had made the requested documents and exhibits "already available for counsel's inspection"); Ford, 2016 WL 4443171, at *15 (denying sex trafficking defendant's motion for bill of particulars, because indictment tracking the statutory language and "indexed discovery disclosures" were "sufficient to meet the objectives of a bill of particulars"); Elbert, 2007 WL 107675, at *4 (finding that sex trafficking indictment tracking the statutory language plus extensive discovery were sufficient and a bill of particulars was not appropriate).

Here, the Government has (both prior and subsequent to the filing of the motions for a bill of particulars) provided extensive pretrial discovery materials to the defendants which provide and describe in depth virtually all, if not all, the additional details whose disclosure is the subject of the defendants' motions for a bill of particulars.   See DE 43 at 10, DE 47 at 10 (providing laundry list of factual details sought to be stated with greater particularity).   The discovery material provided to each defendant includes over 1,200 pages of documents, comprised of investigative reports prepared by various federal and local law enforcement agencies; reports of interviews with

numerous witnesses; [2] various search warrants conducted in the investigation and their applications and supporting documents; and business records, particularly including cell phone records and room rental records for various hotels, among other documents.   The discovery material has further included copies of recorded interviews with witnesses, as well as full and complete copies of the digital contents of various electronic devices belonging to various victims, witnesses, as well as one of the defendants (Jones), which were searched pursuant to search warrants.   The material provided in discovery provides an abundance of detailed information, including all of the information that the defendants request in their motions for a bill of particulars. Accordingly, the motions for a bill of particulars should be denied.

## C.   *The Court Should Deny Defendant Bridges' Motion to Suppress Physical Evidence Recovered from His Vehicle*

Defendant Bridges has filed a motion to suppress evidence recovered from his vehicle pursuant to the execution of a federal search warrant signed on July 13, 2017.   See DE 55. Bridges, who had previously been reported to be trafficking B.T. and others, and who on July 12, 2017, was observed in his vehicle outside the Motel 6 where victim B.T. was about to have a commercial sex date, argues that the law enforcement officers lacked reasonable suspicion to detain him.   Id. at 6-7.   Bridges further argues that the subsequent search warrant authorizing the search of the contents of the vehicle was invalid, and that the evidence recovered from the interior

---

[2]  Much of this material is covered by 18 U.S.C. § 3500 and is not discoverable at this time, but has nevertheless been provided to the defendants by the government, precisely so the defendants can be adequately informed of the details of the evidence to be marshaled against them.

of the car must therefore be suppressed.   Id. at 8-13.   His arguments are meritless, and the motion

should be denied.

     *1.   The Stop of Bridges' Vehicle was Justified by Ample Evidence.*

After law enforcement officers learned that victim B.T. was then being trafficked by

defendant Bridges, and that she was engaging in commercial sex acts out of the Motel 6 at 11580

Roosevelt Boulevard, Philadelphia, investigators conducted an undercover operation designed to

recover B.T.   A law enforcement officer located a recently posted advertisement offering B.T. for

commercial sex on the website Backpage, and engaged in a series of text messages in which the

undercover officer negotiated the terms of a commercial sex act with B.T., which was to occur in

Room 308 of the Motel 6.   The law enforcement officer traveled to the Motel 6 and entered Room

308, where he encountered B.T.   The law enforcement officer gave B.T. $200 in cash in exchange

for a sex act, and then excused himself to the room's bathroom, from which he notified backup

officers to enter the room.   Additional officers entered the room and recovered B.T.

At approximately the same time that this was occurring, other law enforcement officers

were stationed outside Room 308 conducting surveillance.   Officers observed a 2013 Ford Taurus

in the Motel 6 parking lot near Room 308 being driven by Bridges (who did not have a valid

driver's license).   Officers stopped the vehicle and observed Jordan Lopez-Ervin (a person also

known by law enforcement officers to perform commercial sex acts for Bridges) in the passenger

seat.   Also observed in plain view in the car were multiple hotel room keys, boxes of condoms,

and multiple cell phones.   In light of Bridges' inability to lawfully drive the car, the car was

impounded and removed to a lot controlled by the Philadelphia Parking Authority.   A federal

search warrant for the contents of the car was obtained and executed the next day.   See Mag. No. 17-950.

Bridges argues that the law enforcement officers did not have reasonable suspicion to justify the investigative stop of his car.   On the contrary, investigators had more than the requisite reasonable suspicion to stop Bridges' car – they had probable cause.   At the time they stopped Bridges' car, investigators were aware of a multitude of evidence indicating that Bridges was a violent sex trafficker involved with the prostitution of minors.   B.T.'s mother had informed them that B.T. had begun performing commercial sex acts for Bridges (alongside J.S.) when B.T. was sixteen years old, and that Bridges frequently employed violence in his ongoing prostitution of B.T.   B.T.'s mother went on to describe specific instances of beatings of B.T. by Bridges, and occasions on which Bridges had issued threats directly to B.T.'s mother to warn her not to interfere with his relationship with B.T.   B.T. had herself advised law enforcement officers – nearly eight months earlier, at a time when B.T. was still a minor and had been recovered by law enforcement in another undercover sting – that Bridges ran a prostitution enterprise.[3]   On the date of the contested stop of Bridges' vehicle, an undercover officer arranged for a commercial sex act to occur at a motel room, outside of which Bridges was waiting in a car, together with another woman in Bridges' employ.   Moreover, searches of cell phones belonging to defendant Jones (pursuant to a search warrant) and to victim N.G. (with N.G.'s consent) had already been conducted, and had revealed text messages among N.G., Jones, and Bridges that confirmed Bridges' and Jones' joint

---

[3] When law enforcement officers contacted B.T.'s grandmother immediately after B.T.'s November 2016 recovery, B.T.'s grandmother volunteered that B.T. had recently been associating with "an older black male" whose name was recorded phonetically as "D'Cao."

involvement in prostituting additional minor victims, including N.G. and L.C.   It cannot be plausibly maintained under these circumstances that there was no "particularized and objective basis for suspecting [Bridges] of criminal activity."   See United States v. Brown, 448 F.3d 239, 246 (3d Cir. 2006) (describing "reasonable suspicion" standard).   The stop was proper.

> 2.  *The Search of the Vehicle was Lawful.*

Bridges also attacks the validity of the search of the vehicle after it was stopped, pursuant to a federal search warrant.   Bridges' arguments are again meritless.

> a.  The Search Warrant for the Contents of the Vehicle Was Supported by Sufficient Probable Cause.

Bridges argues, unpersuasively, that there was not probable cause to support the warrant authorizing the search of the vehicle.[4]   "Probable cause is a 'fluid concept' that 'turns on the assessment of probabilities in particular factual contexts.   When presented with an application for a search warrant, the magistrate must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"   United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)) (alterations omitted).   "[I]t is well established that direct evidence is not required for the issuance of a search warrant.   Instead,

---

[4]  Because there was probable cause to search Bridges' vehicle, as discussed below, the warrant itself was unnecessary; the search of the vehicle was fully justified pursuant to the Fourth Amendment's automobile exception.   See United States v. Donahue, 764 F.293, 299-300 (3d Cir. 2014) (noting generally that "[t]he automobile exception permits vehicle searches without a warrant if there is probable cause to believe that the vehicle contains evidence of a crime").   Further, as happened here, "the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search."   Id. (quoting United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991)).   That a federal magistrate judge presented with a search warrant application agreed that there was probable cause only reinforces the lawfulness of the search.

probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property."   United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (internal quotation omitted).   Moreover, the Third Circuit has held that a district court must "pay great deference" to the magistrate's initial determination of probable cause, and that its role is "limited to ensuring that a magistrate had a substantial basis" for concluding that the affidavit supporting the warrant established probable cause."   United States v. Miknevich, 628 F.3d 178, 181 (3d Cir. 2011); see also United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) ("The resolution of doubtful or marginal cases in this area should be largely determined by the preference accorded to warrants.") (citations and alterations omitted).

The affidavit submitted in support of the search warrant recounted not merely Bridges' status as the target of an investigation into sex trafficking of minors arising out of the earlier recovery of two minor victims (referring to N.G. and L.C.), but also the information provided by B.T.'s mother[5] regarding Bridges, as well as the circumstances of the undercover operation involving an arrangement for a commercial sex act with B.T., and the observation of Bridges outside the room where the prostitution was to occur.   The affidavit further included the observation of multiple hotel room keys, cell phones and condoms plainly visible inside Bridges' car – items self-evidently constituting evidence of sex trafficking and prostitution – as well as information provided by B.T. herself following her recovery that day, which included the facts that Bridges was her pimp and that Bridges received money from proceeds of commercial sex acts

---

[5] B.T.'s mother was referred to as an anonymous confidential source in the affidavit in order to protect her identity from disclosure for as long as possible.

performed by B.T.; that she had been driven by Bridges to the motel at which the commercial sex act with the undercover officer was to occur; and that B.T. typically engaged in text messages with Bridges over cellular phones regarding her prostitution by Bridges (such as notifying Bridges of when encounters with clients began and ended, and advising Bridges how much money had been received).   The affidavit thus easily demonstrated – in fact, far exceeded – the probable cause necessary to support issuance of the search warrant, as there was far more than a "fair probability" that evidence of prostitution and/or sex trafficking would be located in the vehicle.

                **b.**   Even if the Search Warrant Was Not Supported by Probable Cause, the Agents Acted in Good Faith.

Even were the Court to find that the search warrant was not supported by probable cause, the results of the search warrant would nonetheless not be subject to suppression because the agents acted in good faith in obtaining and executing the search warrant.   "When an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and has acted within its scope, suppression of the fruits of the search because the warrant was issued without probable cause will serve only marginal deterrent purposes which do not justify the substantial costs of exclusion."   United States v. Williams, 3 F.3d 69, 73-74 (3d Cir. 1993) (quoting United States v. Leon, 468 U.S. 897, 906 (1984)) (alteration omitted).   "Suppression therefore is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority."   Id. at 74.   Finally, "an officer who executes a search in reliance on a warrant engages in objectively unreasonable behavior only if a reasonably well-trained officer would realize that the underlying affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"   Id. (quoting Leon, 468 U.S. at 923).   In light of all of the evidence

described in the affidavit in support of the warrant and recounted above, it was objectively reasonable for the agents to rely on the magistrate's determination that probable cause indeed existed in support of the warrant, and that the resulting evidence should not be suppressed, even in the event that this Court reaches the conclusion that probable cause was lacking.

3.   *Bridges is Not Entitled to Suppression of the Contents of Digital Devices Recovered from His Vehicle.*

Bridges further contends that the search warrant and its manner of execution were specifically deficient with respect to the search of cell phones recovered from the car.   He is wrong.

a.   Bridges Lacks Standing to Assert a Fourth Amendment Claim with Respect to Other Persons' Devices.

The Government emphasizes at the outset that no cell phone in Bridges' possession on July 12, 2017 was searched.   The only cell phones found in Bridges' vehicle and searched pursuant to the search warrant were phones belonging to Lopez-Ervin, and a phone (apparently formerly) used by minor L.C.[6]   Bridges lacks standing to assert a constitutional objection to the search of items that belonged to other persons, and in which he therefore had no cognizable privacy interest.   "A defendant must have standing to invoke the Fourth Amendment's exclusionary rule."   United States v. Correa, 653 F.3d 187, 190 (3d Cir. 2011) (citing Stearn, 597 F.3d at 551).   To

---

[6] A laptop belonging to B.T. was also found in the trunk of Bridges' vehicle.   Other phones belonging to B.T. were recovered directly from B.T. inside the room in which the commercial sex act with the undercover officer was to occur.

demonstrate standing, "the individual challenging the search [must] have a reasonable expectation of privacy in the property searched."   Id.

The Third Circuit has held that a defendant does not have standing to challenge the admission of evidence obtained from another person's cell phone.   In United States v. Brewer, 708 F. App'x 96 (3d Cir. 2017), the defendant challenged the validity of a search warrant, pursuant to which a cell phone seized from his co-defendant was searched.   The Court of Appeals held that the fact that the cell phone was seized from his co-defendant, who claimed ownership and control of it, together with the lack of evidence that the defendant had the ability to exclude other persons from using the phone, meant that the defendant lacked standing to challenge the search of the phone.   See id. at 99; cf. United States v. Monestime, 677 F. App'x 76, 81 n.4 (3d Cir. 2017) (noting, after rejecting defendant's challenge to search of cell phone on alternative grounds, that "[w]e question Monestime's standing to bring his claim about that cell phone in the first instance" because he claimed on various occasions in court that the cell phone at issue did not belong to him).   Other Courts of Appeals are in agreement.   See United States v. Stringer, 739 F.3d 391, 396 (8th Cir. 2014) (defendant lacked standing to challenge search of phone belonging to minor victim); United States v. Dore, 586 F. App'x 42, 46 (2d Cir. 2014).

       b.   The Search of the Devices was Lawfully Conducted.

Even if Bridges had standing to contest the constitutionality of the search of cell phones belonging to other persons, his challenge would fail on the merits.   Bridges' argument in this regard is fairly obscure; although he extensively cites United States v. Stabile, 633 F.3d 219 (3d Cir. 2011), and discusses non-binding decisions issued by other Courts of Appeals, Bridges' motion fails to clearly and explicitly identify a purported flaw in the search warrant issued in this

17

case, or in the manner in which it was executed.   In any event, Stabile is critically distinguishable from the instant case, and would not require exclusion of any evidence even if it were applicable.

In Stabile, a law enforcement officer executed a search warrant which permitted him to examine the defendant's hard drive only for evidence of financial crimes.   As he did so, he also observed on the hard drive evidence of the presence of child pornography on the hard drive, in the form of files with highly suggestive filenames, and with filename extensions typically associated with video files.   Id. at 227.   The detective viewed several of the files to confirm that they indeed contained child pornography, before ceasing his review of the hard drive.   Id.   The Third Circuit held that the detective properly opened, and examined the filenames of the files contained within, the folder in which the child pornography files were located, under the "plain view" doctrine.   Id. at 240-42.   The Court declined to address whether the "plain view" doctrine further applied to the detective's inspection of the files' contents, ultimately affirming, on other grounds, the district court's refusal to exclude the evidence.   Id. at 242-46.

Thus, Stabile simply did not establish any particular protocol required to be applied in cases involving the search of digital information stored on an electronic device, and the search conducted in this case could not have run afoul of any such requirement.   Even if it had, Stabile would be inapplicable to the instant case because Stabile involved the recovery of evidence of one type of offense (child pornography) during execution of a warrant which authorized a search for evidence of totally distinct offenses (financial crimes).   That is not the case here.   Rather, the warrant challenged by Bridges in this case specifically authorized the search of the devices for various categories of items which would plainly, if located, constitute evidence of unlawful sex trafficking, and it was precisely this information for which agents searched, was indeed located on the devices,

and which the Government seeks to introduce at trial.   Therefore, even to the extent that <u>Stabile</u> prescribed a particular procedure to be followed in a case where evidence of crimes not discussed in the search warrant is unexpectedly located on an electronic device pursuant to a separate search, it is nevertheless inapt.   <u>See also Ford</u>, 2016 WL 4443171, at *11-12 (rejecting alleged pimp's argument that the search warrant for his devices was an "illegal 'general warrant' that allowed officers to indiscriminately comb his electronic devices . . . [and] should have included specific electronic media search protocols") (citing <u>United States v. Flores</u>, 802 F.3d 1028, 1044-45 (9th Cir. 2015)).   None of the evidence from the vehicle should be suppressed.

> **D.      The Court Should Deny Defendant Jones' Motion to Suppress Evidence Recovered From Motel 6 on November 15, 2016**

Jones argues that evidence seized from the Motel 6 in which he was located with two minor victims, N.G. and L.C., shortly after a commercial sex act had occurred involving minor L.C. must be suppressed.   DE 65.   Jones argues that law enforcement officers violated his Fourth Amendment rights by entering the room after minor N.G. opened the door in response to a knock by an investigating officer.   Jones further argues that the search warrant subsequently obtained for his cell phone was invalid, and that the digital evidence recovered from his phone is subject to suppression.   His arguments lack merit, and his motion to suppress should be denied.

> *1.   Law Enforcement Officers' Entry into the Motel Room Is Not a Cause for Suppression.*

> > a.   Jones Lacked a Reasonable Expectation of Privacy in the Motel Room He Used to Traffic Two Minor Victims.

"A defendant must have standing to invoke the Fourth Amendment's exclusionary rule." <u>United States v. Cortez-Dutrieville</u>, 743 F.3d 881, 883 (3d Cir. 2014) (quoting <u>United States v.</u>

Correa, 653 F.3d 187, 190 (3d Cir. 2011)).   "A defendant has standing if he can establish that he had a legitimate expectation of privacy in the invaded place."   Id.   "An individual's expectation of privacy is legitimate if: (1) the individual demonstrated a subjective expectation of privacy in the subject of the search and (2) this expectation of privacy is objectively reasonable."   Id. at 884. "The subjective prong requires a court to determine whether the defendant, 'by his conduct, has exhibited an actual expectation of privacy.'"   Id. (quoting Bond v. United States, 529 U.S. 334, 338 (2000)).   "The objective prong requires a court to determine whether the defendant's expectation of privacy is one that society is prepared to recognize as reasonable."   Id. (citations omitted).   It is the defendant who "bears the burden of proving . . . that he had a legitimate expectation of privacy."   United States v. Donahue, 764 F.3d 293, 298 (3d Cir. 2014) (citation omitted)).

Although "an overnight guest in a home may claim the protection of the Fourth Amendment," Minnesota v. Carter, 525 U.S. 83, 90 (1998), "one who is merely present with the consent of the householder may not."   Id.   The same holds true of a motel room.   See, e.g., United States v. Grandstaff, 813 F.2d 1353, 1357 (9th Cir. 1987) ("Although a guest who stays overnight and keeps personal belongings in the residence of another might have a reasonable expectation of privacy, mere presence in the hotel room of another is not enough.") (citations omitted)).   See generally United States v. Whitted, 541 F.3d 480, 488 (3d Cir. 2008) (citing Stoner v. California, 376 U.S. 483, 490 (1964)).

Jones has not established that he was an "overnight guest" at the motel.   Notably, the room was not reserved in his name; he had no bags, clothing, toiletries, or other belongings in the room; and, despite being found in the room at 3:15 a.m., was not sleeping but rather found in the bathroom

shortly after a prostituted minor engaged in a commercial sex act.   Indeed, Jones himself points out that the john who had engaged in the sex date with the victim "made no mention of any male being present in the motel room" at that time.   DE 65 at 12.   The Courts of Appeals have repeatedly held that such a defendant lacks standing to challenge entry into the motel or hotel room in which he was found.   See, e.g., United States v. Irizarry, 673 F.2d 554, 556-57 (1st Cir. 1982) (defendant lacked standing to challenge entry into hotel room where he was found in the early morning hours, when room was registered to co-defendant and he offered "no evidence of any personal interest in the room beyond his being 'merely present'"); Grandstaff, 813 F.2d at 1354, 1357 (defendant had "no standing to challenge the agent's entry into the [hotel] room" where he had been found in the bathroom, when room was registered in co-defendant's name and defendant did "not show[ ] that he shared [the] room, stayed there overnight or even that he had his luggage there") (alterations in original); United States v. Conway, 73 F.3d 975, 978-80 (10th Cir. 1995) (defendant found completely undressed in motel room at 1 a.m., in possession of key, had demonstrated "mere physical possession or control" of the room, not that he was an "invited guest of the renter of [the room]," and thus lacked standing); United States v. Wells, 739 F.3d 511, 522-24 (10th Cir. 2014) (defendant who was "merely present in the [motel] room for a very limited amount of time" as part of a criminal enterprise lacked a reasonable expectation of privacy in the room); see also United States v. Larios, 593 F.3d 82, 90-91, 93 (1st Cir. 2010) (no reasonable expectation of privacy for defendant who engaged in surveillance for, and otherwise assisted, codefendants' drug transaction at motel, as he was only in the motel room for minutes).

Rather, the facts show that Jones' presence at the motel was not for overnight respite and privacy for sleeping, but instead as a pimp engaged in services for the defendants' commercial sex

21

enterprise.   The commercial and illicit purpose of the room further eliminates any standing Jones could try to claim.   As the Supreme Court has explained, "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." Carter, 525 U.S. at 90.   In Carter, for example, the Court explained that the defendants lacked a reasonable expectation of privacy because they "were not overnight guests, but were essentially present for a business transaction [bagging cocaine] and were only in the home a matter of hours." Id.   "While the apartment was a dwelling place for [the lessee], it was for these [defendants] simply a place to do business."   Id.   Accordingly, "any search which may have occurred did not violate their Fourth Amendment rights."   Id. at 91; accord United States v. Almonte-Baez, 857 F.3d 27, 32 n.4 (1st Cir. 2017) ("Individuals present at a stash house generally have no reasonable expectation of privacy."); see, e.g., United States v. Chong, 720 F. App'x 329, 332 (9th Cir. 2017) (citing United States v. Zermeno, 66 F.3d 1058, 1061 (9th Cir. 1995)).

Furthermore, to the extent Jones was not authorized to be in the motel room—for example, because of his probationary status and/or outstanding arrest warrant arising out of his court proceedings in other states—these additional reasons preclude Jones from establishing standing to challenge the entry.   See Cortez-Dutrieville, 743 F.3d at 884 ("[L]ike a trespasser, a squatter, or any individual who 'occup[ies] a piece of property unlawfully,' Dutrieville's presence in the home [in violation of the protection order] was 'wrongful,' and therefore any expectation of privacy he may have had was not one that society is prepared to recognize as reasonable.") (footnotes omitted); Ford, 2016 WL 4443171, at *6 (holding that alleged pimp lacked expectation of privacy in motel room when motel staff and officers notified him and other occupant they were being evicted for staying past their check-out time and engaging in suspected prostitution).   Likewise,

22

to the extent he was on probation and subject to warrantless searches, he did not have a legitimate expectation of privacy that was violated by law enforcement's entry, considering the evidence of criminal activity in the room he was in.   See, e.g., Sanders v. Bishop, No. 1:06-cv-1264, 2008 WL 5424105, at *8 (E.D. Cal. Dec. 29, 2008) ("It is undisputed Plaintiff was on probation subject to warrantless search at the time of the arrests. . . . [T]here is no material fact dispute that Plaintiff could be searched for any reason, without a search or arrest warrant.").

In sum, Jones has not proven a legitimate expectation of privacy in the motel room in which he was found, and thus is not entitled to suppression of any evidence based on the circumstances of the entry.

> b.  Law Enforcement Officers' Entry into the Motel Room Was in Any Case Independently Justified due to the Existence of Exigent Circumstances.

Even if Jones had a reasonable expectation of privacy in the motel room, law enforcement's entry was proper under the "exigent circumstances" exception to the search warrant requirement. "It is well established that 'exigent circumstances' . . . permit police officers to conduct an otherwise permissible search without first obtaining a warrant."   Kentucky v. King, 563 U.S. 452, 455 (2011).   "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."   Brigham City v. Stuart, 547 U.S. 398, 403 (2006); accord King, 563 U.S. at 461 (reaffirming that entry "to protect an occupant from imminent injury" falls within the exigent-circumstances exception).   Another is "the need to prevent the destruction of evidence."   King, 563 U.S. at 455.   Both exigencies were present in this case, as well as probable cause to believe that crimes had been committed and that evidence thereof would be found inside.

23

Even before approaching the motel room, authorities had probable cause to believe that illicit activity was occurring in the room: At approximately 2:30 a.m., Officer Lis had seen a male enter a room at the Motel 6—a motel known for prostitution and drug trafficking—and leave shortly thereafter.  Upon conducting a traffic stop of the male, Officer Lis confirmed that the driver had engaged in commercial sex with a young female at the motel.  Contrary to Jones' contention that the information Officer Lis received was simply from an "unreliable informant," D.E. 65 at 1, Officer Lis actually saw the Backpage advertisement for commercial sex indicating that the female was young, as well as text messages between the female and male arranging the commercial sex date.  D.E. 65.[7]  Officer Lis also smelled marijuana emanating from the john's car.   The john was cited, and officers returned to the Motel 6.

When officers approached the room in which the john and text messages had stated the commercial sex date had occurred, the officers—who are experienced in drug detection, among other law enforcement matters—could smell marijuana coming from the room.  They thus had probable cause to believe that drug offenses were occurring inside.

Officers then knocked on the door, identifying themselves as the police, to seek entry, as they were lawfully entitled to do.   See King, 563 U.S. at 463 ("[O]fficers may seek consent-based encounters if they are lawfully present in the place where the consensual encounter occurs."); id. at 466-67 (rejecting the view that officers should be faulted and deemed to have created an exigency "if, after acquiring evidence that is sufficient to establish probable cause to search

---

[7] Although the Backpage ad stated that the female was "20," law enforcement was aware that minors were frequently advertised on Backpage, that Backpage would not allow posts for females if their age was said to be under 18, and that posts for minors were thus usually written with an age at or slightly above 18.

particular premises, the officers do not seek a warrant but instead knock on the door and seek either to speak with an occupant or to obtain consent to search").   The occupants did not immediately open the door.   Rather, while waiting outside the door and looking at the window covered by a curtain, Corporal Alpaugh could see the shadow of figures moving in the room and then the lights go out.   Corporal Alpaugh became concerned that the occupants may be flushing evidence of the drugs or otherwise endeavoring to convince law enforcement to leave the premises so that the occupants would not be caught engaging in, or with evidence of, their criminal activity.

When N.G. opened the door, Officer Lis immediately noticed that she appeared to match the young female posted for commercial sex in the Backpage ad and saw school books on the bed behind her, giving additional reason to believe that this female was a minor being sex trafficked.[8] Simultaneously, the smell of the marijuana increased with the opened door, and Officer Lis could immediately see drug paraphernalia on the nightstand between the two beds.   By this point at the

---

[8] With respect to Jones' argument that N.G. could not have consented to a search of the room, Jones notably acknowledges that N.G. *was* a minor victim of sex trafficking.   D.E. 65 at 8-9.   But her status as a victim does not mean she could not consent to a search of the premises in which she was held.   See, e.g., United States v. Thomas, No. 3:14-cr-31, 2015 WL 164075, at *6 (D. Conn. Jan. 13, 2015) ("MV had actual and apparent authority to consent to the search of Room 202.   That her name was not on the registration counts for little.   MV was a minor victim of sex trafficking, and the absence of her name from the hotel's books says more about the illegality of Thomas's operation than it says about MV's relationship to the property in issue: of course Thomas would not register the room in her name.   As for the key, it is true that MV lacked one at the time the agents found her, and this suggests she was not able to come and go with absolute freedom.   But it is unsurprising that Thomas would choose to prevent his victim from moving about the hotel with perfect liberty.   MV's lack of a key reveals much about her relationship with Thomas, but little about her relationship with Room 202.").

Nor did the officers coerce N.G. into opening the door.   See, e.g., King, 563 U.S. at 471 (finding "no evidence that the officers either violated the Fourth Amendment or threatened to do so prior to the point when they entered the apartment," when they "'banged on the door as loud as [they] could' and announced either 'Police, police, police' or 'This is the police.'   This conduct was entirely consistent with the Fourth Amendment, and we are aware of no other evidence that might show that the officers either violated the Fourth Amendment or threatened to do so (for example, by announcing that they would break down the door if the occupants did not open the door voluntarily).").

latest, there was not only probable cause to believe that sex trafficking of a minor and drug offenses were occurring, but also exigent circumstances compelling a warrantless entry.

"Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain." King, 563 U.S. at 461.   Here, the occupants were aware that the officers outside their door knew of the illicit drug activity occurring in the room; there was thus a legitimate risk that evidence would be destroyed if officers took the time to obtain a search warrant.   See, e.g., King, 563 U.S. at 455-56, 472 (holding that exigent-circumstances exception applied when officers "detected a very strong odor of burnt marijuana," knocked on the door loudly while announcing themselves as police officers, and the officers believed that based on the occupants' response—people inside moving, but not answering the door—drug-related evidence was about to be destroyed); Almonte-Baez, 857 F.3d at 29-30, 33-34 (affirming probable cause and exigent circumstances when officers observed individual leaving apartment under circumstances suggesting drug activity, pulled him over and obtained additional evidence of the drug transaction having occurred, returned to the apartment where they knocked and announced their presence, and heard the occupant moving away from the door rather than answer, at which point they forced entry); United States v. Tobin, 923 F.2d 1506, 1510-12 (11th Cir. 1991) (en banc) (holding exigent circumstances existed when officers smelled marijuana as house door opened after their knocking, because "the defendants and anyone else who might have been present in the house would have been aware of the agent's suspicions at that moment," and even before knocking because it appeared the defendants were "either aware or afraid that someone [in law enforcement] was watching them"); Hardy v. Broward Cnty. Sheriff's Office, 238 F. App'x 435, 441-42 (11th Cir. 2007) (holding that exigent

26

circumstances existed to enter apartment where officers smelled burnt marijuana emanating from a partially open door because, had the officers delayed entering, they risked the "loss, destruction, removal, or concealment of evidence").

Moreover, it has been repeatedly and "sensibly held that the potential sexual exploitation of a minor is an exigent circumstance." United States v. Gilliam, No. 11-cr-1083, 2012 WL 4044632, at *2 (S.D.N.Y. Sept. 12, 2012); see, e.g., United States v. Price, No. 17-cr-301, 2017 WL 4838307, at *3 (E.D.N.Y. Oct. 23, 2017) ("[S]ome circumstances have consistently been held to be exigent, and so covered by the exception: '[t]he potential sexual exploitation of a minor is an exigent circumstance.'") (citation omitted).

In United States v. King, for example, law enforcement found an online advertisement offering sexual services from a female who "purported to be 19 years old" and, to investigate whether she was violating state prostitution laws, scheduled a date with her at a nearby motel. 560 F. Supp. 2d 906, 910 (N.D. Cal. 2008).   At the motel, they saw a man exit the room in which the desk clerk told police the female was staying, and based on their training and experience, assumed the man was either a pimp or customer.   Id.   They knocked on the door and announced their presence.   Id. at 911.   After additional knocking, a female who appeared to be the female in the advertisement opened the door.   Id.   Upon seeing her, law enforcement suspected that she was a minor and, at that point, entered the room, where they conducted a protective sweep and questioned her about her identity.   Id.   She initially maintained that she was 19 years old and that the defendant—who had been outside the room at the time of entry—was her boyfriend.   Id.   She soon admitted that she was engaged in prostitution, and after additional investigation officers

found a medical card with her true name and date of birth, which showed she was indeed a minor. Id. at 912.

The court found that, "[u]nder the totality of the circumstances, the government's entry was objectively reasonable." Id. at 916. "[T]he need to enter the hotel room and secure [the suspected minor] was justified by the likelihood that [she] would be subjected to repeated sexual contact if left unprotected." Id. Though the defendant "contend[ed] that other options—such as obtaining a warrant for custody—were available to the police," the court reasoned that, "at the time, the officers did not know whether a customer or pimp was still in the room. Entry was necessary to immediately secure Doe's person and to protect the minor." Id.; see also id. ("The Fourth Amendment is designed to deter police misconduct, but it was not intended to be applied in an overly-formalistic manner to punish police who take immediate action to secure the person of a minor being used for sexual services.").

In another factually similar case, United States v. Shingles, detectives knocked on a motel room door after receiving information that a minor trafficking victim was potentially inside the room. No. 3:15-cr-45, 2015 WL 5895457, at *7 (M.D. Fla. Oct. 6, 2015). "[T]he motel room door opened wide enough for the officers to see [a] beaker containing crack cocaine in plain view." Id. The court explained that, "[a]t that point, the officers had probable cause to believe that a search of the room would uncover evidence of a crime." Id. "Additionally, exigent circumstances existed to enter the motel room because the officers had a reasonable basis to believe that the drugs and drug paraphernalia might be destroyed before a warrant could be secured." Id.; see also id. (concluding that "the officers' original motivation for investigating . . . —to potentially

retrieve a minor at risk of sexual exploitation—constituted an additional exigency under the totality of the circumstances").

Numerous other cases are in accord.   See, e.g., United States v. Kenfield, 270 F. App'x 695, 696-97 (9th Cir. 2008) (recognizing that the exigent circumstances exception extends to situations where a minor is at risk of sexual contact, and finding exception applicable where an officer approached the defendant's trailer after receiving an anonymous tip that a girl was getting drunk with a man known to have engaged in sexual conduct with minors, the officer smelled marijuana, and when he knocked, he heard music stop playing, the lights go out, and running); United States v. Thomas, No. 3:14-cr-31, 2015 WL 164075, at *2, *4-5 (D. Conn. Jan. 13, 2015) (exigent circumstances existed when agents received report of minor advertised in Backpage ad and believed her to be at hotel, they knocked and identified themselves at door where they believed victim might be, no one answered despite lights being on, and concerned that she was in danger of sexual exploitation they obtained a universal key at the front desk and entered the room); Price, 2017 WL 4838307, at *4-5 (exigent circumstances and emergency-aid exception applied when "officers had information prior to entering [the defendant's] Residence that Doe was a minor and reported missing" and there "was also strong circumstantial evidence that she was engaged in a sexual relationship and likely in imminent danger, whether it be at the hands of Defendant or self-inflicted," and noting "[t]he danger of being statutorily raped or being sexually exploited would be sufficient for the emergency-aid exception to apply"); cf. Gilliam, 2012 WL 4044632, at *1-2 (exigent circumstances existed for cell phone provider to disclose data to law enforcement without warrant when juvenile had been reported missing and prostituted); United States v. Williams, No. 12-CR-6152, 2015 WL 3454430, at *4-5 (W.D.N.Y. May 29, 2015) (upholding warrantless search

of apartment due to officers' reasonable belief that it was necessary to enter apartment in order to render emergency aid to minor advertised on Backpage and held against her will for prostitution).

        c.   Entry of Officers into the Motel Room Was Not Unlawful in light of the Pending Warrant for Jones' Arrest.

To the extent Jones can be considered to have had a privacy interest in the motel room, the fact that he had an outstanding arrest warrant obviates the need for a separate search warrant, as law enforcement could have entered to effectuate it and would have seen exactly what they did see.

It is well established that "an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest."   <u>Steagald v. United States</u>, 451 U.S. 204, 221 (1981).   "If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.   Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."   <u>Id.</u> at 214 n.7 (quoting <u>Payton v. New York</u>, 445 U.S. 573, 602-03 (1980)); <u>see, e.g.</u>, <u>United States v. Bergin</u>, 732 F. Supp. 2d 1235, 1244 (M.D. Fla. 2010) ("With these assumptions [that the defendant had a reasonable expectation of privacy in the location he was], the officer's entry into the screened-in porch was nonetheless lawful. There were two outstanding felony arrest warrants against Jason Bergin for violation of probation. The officers could lawfully enter the house to arrest defendant because there was a valid outstanding arrest warrant, the location was defendant's residence, and defendant was inside the residence.").

30

It is undisputed that Jones had an outstanding arrest warrant at the time law enforcement entered the motel room.   Thus, he was subject to detention by law enforcement, including in his own living space, and both a search incident to that arrest warrant's execution and/or what would be visible in plain sight while effectuating the arrest would have resulted in seizure of the same evidence.   *See also infra* Section 2.b-c.   For all these reasons, law enforcement's entry into the motel room was not unlawful and does not warrant suppression of evidence.

      2.   *Both the Seizure of Jones, and the Seizure of Evidence from Jones, Were Fully Justified.*

Jones further argues that, after law enforcement officers discovered two minor females in a motel room in which a commercial sex act had just occurred and then located him concealed in the room's bathroom, the officers committed a violation of his constitutional rights by subjecting him to an investigative stop, and further by briefly frisking Jones.   DE 65 at 11-15.   The argument is meritless.

      a.   Ample Evidence Existed to Demonstrate Reasonable Suspicion Justifying an Investigatory Stop and Frisk of Jones.

An investigative stop is justified "when the officer has a reasonable, articulable suspicion that criminal activity is afoot."   United States v. Johnson, 592 F.3d 442, 447 (3d Cir. 2010) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).   A law enforcement officer's determination of reasonable suspicion is to be "afford[ed] significant deference."   United States v. Foster, 891 F.3d 93, 104 (3d Cir. 2018).   Moreover, a "trained officer may find reasonable suspicion 'based on acts capable of innocent explanation,'" and a reviewing court "must consider the totality of the circumstances, including the police officer's knowledge, experience, and

common sense judgments about human behavior."   Id. (quoting United States v. Graves, 877 F.3d 494, 499 (3d Cir. 2017), and United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)).

        The evidence and circumstances described above are plainly more than sufficient to demonstrate a "reasonable, articulable suspicion" that Jones was involved in criminal activity. From speaking to the john and reviewing the text messages he shared with them, law enforcement officers knew to a virtual certainty that a commercial sex act had just occurred in the room in which they had just encountered two young females; the officers had observed schoolbooks belonging to one of the young females in the room, tending strongly to show that she was a minor; and the officers had further detected the overwhelming and unmistakable odor of marijuana.   It was in the bathroom of this room that the officers located Jones, who had been concealed behind the bathroom's closed door when the officer first entered.   Moreover, Officer Lis had earlier observed Jones walking away from the room to which he had observed the john traveling to engage in the commercial sex act shortly before it occurred.   Both officers were further keenly aware of the high frequency of sex trafficking, prostitution, and illegal narcotics activity both at the Motel 6 in particular, as well as generally at other hotels in the area, having frequently responded to the Motel 6 and other hotels under similar circumstances in the past.   From those experiences, the officers were aware that a person found hiding in the bathroom in a motel room in which prostitution was occurring was likely either to be a client (somewhat less likely in this particular case, since the officers had responded to the room shortly after observing a client leaving the room and stopping the client as he drove away), or someone providing "protection" or otherwise supervising or monitoring the prostitution occurring in the room.   The officers were further aware that a person providing "protection" for a prostitution or sex trafficking enterprise might well be armed,

facilitating the provision of "protection" against robbers or agitated clients.   Under all of these circumstances, the officers clearly were more than reasonable in suspecting that Jones was involved in criminal activity and further to conduct a brief frisk of Jones to ensure that he was not armed.   District courts confronted with similar circumstances in sex trafficking cases have so held. See, e.g., United States v. Henry, No. 2:14-cr-64, 2014 WL 5323613, at *12 (D. Me. Oct. 17, 2014) (finding reasonable suspicion to support pat down of leather coat hanging on metal rack in motel room where defendant had been located with minor sex trafficking victim because, among other additional circumstances, the officer knew the motel "was a location frequented by people engaged in sex and drug trafficking"; because on the day of the pat down the officer had personally "observed people who appeared to be engaged in such activities"; and because "the room smelled and had a haze from burnt marijuana").   The stop and frisk were lawful.

> b.  The Evidence Recovered from Jones' Person Would Have Inevitably Been Discovered in the Absence of the Frisk.

Even if the frisk of Jones was not authorized, the evidence recovered from Jones' person (including the key to the motel room, a prepaid debit card, and phone) is nevertheless not subject to suppression because the evidence would have inevitably been discovered by the officers after they learned that there was an outstanding warrant for Jones' arrest, took Jones into custody, and searched him incident to the arrest pursuant to the officers' standard protocol – all of which would have occurred even if the frisk had not been conducted.   See United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998) (observing that "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been

discovered by lawful means, then the deterrence rationale has so little basis that the evidence should be received") (quoting Nix v. Williams, 467 U.S. 431 (1984)) (alterations omitted).

After initially encountering Jones and the minor victims inside the motel room, Officer Lis returned to his vehicle, where he learned from record checks that Jones had a pending warrant for his arrest.   Officer Lis was then obligated to place Jones under arrest; Officer Lis thus would have done so regardless of what, if anything, had been recovered from Jones pursuant to the frisk conducted by Corporal Alpaugh upon their initial encounter.   See Utah v. Strieff, 136 S. Ct. 2056, 2062 (2016) ("[O]nce Officer Fackrell discovered the warrant, he had an obligation to arrest Strieff.   'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'") (citation omitted).   Moreover, once Jones was placed under arrest, Jones would have been searched incident to arrest as a matter of course.   See id. at 2063; United States v. Shakir, 616 F.3d 315, 317-18 (3d Cir. 2010) (describing scope of permissible search incident to arrest as including "the arrestee's person and the area within his immediate control") (citation omitted).   The search incident to arrest, being broader in scope than the patdown conducted by the officers, would inevitably have yielded at least the same evidence that was produced by the patdown.   That evidence would therefore have been discovered by alternative lawful means, even had the officers not conducted the initial frisk of Jones.   The evidence is thus admissible, even if this Court were to find that the frisk of Jones was unlawful.

c. Even if the Officers' Conduct was not Lawful, the Circumstances of the Discovery of Evidence on Jones' Person were Sufficiently Attenuated from the Conduct to Render Exclusion Inapplicable.

In a recent decision involving factual circumstances strikingly similar to this case, the Supreme Court recognized that evidence recovered from the person of an individual who was stopped unlawfully, and who officers subsequently learned was the subject of a valid and pending arrest warrant, is not subject to suppression because the existence of the arrest warrant "breaks the casual chain" of events between the unlawful police action and the discovery of the evidence. Utah v. Strieff, -- U.S. --, 136 S. Ct. 2056, 2062 (2016). Evidence discovered under those circumstances is admissible because the "discovery of the arrest warrant attenuate[s] the connection between the unlawful stop and the evidence seized" from the person stopped. Id. at 2064.

In Strieff, a police officer stopped the defendant walking in a parking lot and detained him without reasonable suspicion that the man was engaging in criminal activity.[9] During the unlawful stop, the defendant provided identification to the police officer, which the officer relayed to a police dispatcher, who responded by informing the officer that a warrant for the defendant's arrest was pending. The officer placed the defendant under arrest and searched him incident to the arrest, revealing methamphetamine and drug paraphernalia on the defendant's person. Id. at 2060.

---

[9] More precisely, the Court assumed without deciding that the initial stop lacked reasonable suspicion and thus was unlawful. 136 S. Ct. at 2062.

35

The Supreme Court held that the evidence recovered from the defendant's person was admissible, notwithstanding the unconstitutionality of the initial stop.   The Court began by recognizing that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"   Id. at 2061 (quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).   Applying that attenuation doctrine to the particular situation before it, the Court recognized three factors, first articulated in Brown v. Illinois, 422 U.S. 590 (1975), as controlling:

> First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.   Second, we consider the presence of intervening circumstances.   Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct.

Strieff, 136 S. Ct. at 2062 (internal quotations and citations omitted).

The Strieff Court recognized that application of the first factor favored suppression, since only a brief period of time elapsed between the officer stopped the defendant unlawfully and the recovery of the evidence.   Id.   However, the Court went on to note that the second factor "strongly favor[ed]" admission of the evidence, noting particularly that "the warrant was valid, it predated [the officer's] investigation, and it was entirely unconnected with the stop."   Id.   The Court observed that the officer's arrest of the defendant was "independently compelled by the pre-existing warrant" and that once the arrest was made, "it was undisputedly lawful to search Strieff as an incident of his arrest" to protect the officer's safety.   Id. at 2063.   Finally, as to the third factor, the Court observed that though the officer acted unconstitutionally in stopping the

36

defendant, the conduct was not "purposeful or flagrant," emphasizing that although the officer lacked a sufficient basis to conclude that the defendant had just been involved in an illegal drug transaction and should have simply asked to speak with him instead of detaining him, "these errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights." Id. After weighing all of those factors, the Court concluded that "the evidence discovered on Strieff's person was admissible because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant," reasoning that "[a]lthough the illegal stop was close in time to Strieff's arrest, that consideration is outweighed by two factors supporting the State." Id.

The facts of this case line up precisely, in all relevant respects, with Strieff. As in Strieff, a relatively brief period of time elapsed between the allegedly unconstitutional entry into the motel room and the discovery of the evidence on Jones' person. However, just as in Strieff, the existence of the outstanding warrant for Jones' arrest was itself valid, predated the officers' approach to the Motel 6, and was entirely unconnected with the officers' investigation (it had been issued by authorities in Maryland). Finally – and again as in Strieff – the officers' purported misconduct (if the Court concludes that there was a Fourth Amendment violation at all) was not purposeful or flagrant. Instead, as described in more detail elsewhere in this response, the officers sought to investigate ongoing prostitution and potential sex trafficking that was confirmed to then be occurring in the motel room by an admitted john, and which had apparently been conducted by young females who were accompanied by a set of schoolbooks and the strong scent of marijuana. Under these circumstances, any constitutional violation (if there is deemed to have been one) cannot be said to have been purposeful or flagrant. The straightforward application of Strieff thus requires that the evidence recovered from Jones' person be admitted, in light of the warrant for

Jones' arrest, a "critical intervening circumstance that is wholly independent of the illegal stop" that "broke the causal chain between the unconstitutional stop and the discovery of evidence" from Jones.  Id.; accord United States v. Burr, No. 2:16-cv-165, 2017 WL 551544, at *5-6 (Jan. 17, 2017) (R&R denying suppression of evidence seized from defendant unlawfully stopped outside motel where prostitution and drug trafficking were common, because of subsequently discovered arrest warrant), adopted, 2017 WL 432463, at *1 (N.D. Ala. Feb. 1, 2017).  Jones' motion to suppress should be denied.

### 3.  The Warrant Authorizing the Search of Jones' Phone Was Valid.

Jones further argues that the warrant authorizing the search of his cell phone was invalid for various reasons.  First, Jones argues that the warrant for the search of the cell phone was irretrievably tainted by the "unlawful entry into Room 614 and the subsequent unlawful seizure of Mr. Jones."  DE 65 at 20.  However, for all of the reasons given above, neither the officers' entry into the motel room nor their seizure of Jones was unlawful.  The information obtained thereby and included in the affidavit in support of probable cause for the search warrant thus did not taint the search warrant application with unconstitutionality.

Second, Jones argues that the search warrant for his cell phone was impermissibly general, id. at 22-26, but the argument both misstates the applicable factual circumstances and misapplies the law.  Jones claims that "the warrant failed to identify with particularity the contents of the phone to be searched," id. at 23, but the warrant in fact identified the phone by make, model and International Mobile Equipment Identifier (IMEI) number,[10] and further made clear that "all user

---

[10]  An IMEI number is a unique serial number identifying a particular handset.

generated data stored on the handset and/or SIM card" would be searched.   Jones' argument that

the warrant thus became "limitless" and thus insufficiently particularized is entirely unpersuasive.

It would be as well for a defendant to argue that a commonplace search warrant authorizing the

search of the entirety of a particular residence is unconstitutionally "limitless," or that a routinely-

issued search warrant authorizing the search of the entire contents of a particular briefcase, mail

parcel or safe deposit box is equally "limitless."   As the Second Circuit explained in United States

v. Ulbricht, 858 F.3d 71 (2d Cir. 2017), in the course of discussing the execution of a warrant

authorizing the search of a laptop computer:

> A warrant may be broad, in that it authorizes the government to search an
> identified location or object for a wide range of potentially relevant material,
> without violating the particularity requirement. For example, a warrant may allow
> the government to search a suspected drug dealer's entire home where there is
> probable cause to believe that evidence relevant to that activity may be found
> anywhere in the residence. Similarly, "[w]hen the criminal activity pervades [an]
> entire business, seizure of all records of the business is appropriate, and broad
> language used in warrants will not offend the particularity requirements."

858 F.3d at 102 (quoting United States Postal Serv. v. C.E.C. Servs., 869 F.2d 184, 187 (2d Cir.

1989)).

Jones emphasizes that execution of the search warrant "produced information far outside

the probable cause on which the warrant rested," id. at 24, but the point is irrelevant.   The Fourth

Amendment's prohibition on general warrants does not mean that a warrant is unconstitutional

unless the officers executing it observe evidence of the crime for which probable cause existed –

and absolutely nothing else.   To accept this argument would be necessarily to hold that a search

warrant authorizing the search of a narcotics storage location, for example, would become

unconstitutional if the officers executing it observed anything at all other than evidence of

narcotics trafficking.   The suggestion is illogical and not an accurate statement of the law. Moreover, contrary to Jones' suggestion, the Third Circuit has never held, in <u>Stabile</u> or elsewhere, that it is impermissible to execute a search warrant on a digital device in the manner in which it was done in this case – that is, by extracting all of the data on the device and searching through that data for evidence of the crime at issue.   This is wholly unsurprising, since there is no other practical and forensically sound way of conducting searches of electronically-stored information. Thus, district courts in sex trafficking cases have rejected arguments identical to the one advanced by Jones here.   <u>See, e.g.</u>, <u>Ford</u>, 2016 WL 4443171, at *11-12 (rejecting alleged pimp's argument that the search warrant for his devices was an "illegal 'general warrant' that allowed officers to indiscriminately comb his electronic devices . . . [and] should have included specific electronic media search protocols," noting that "[o]ver-seizing is an accepted reality in electronic searching because '[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents'") (quoting <u>Flores</u>, 802 F.3d at 1044-45).

To the extent Jones' motion can be read as attacking the search warrant for failing to adequately identify the particular items to be seized from the cell phone, the motion misses the mark.   The search warrant expressly described the specific types of information sought to be recovered, including "user information, image files, video files, ring tones, audio files, e-mails, websites visited, call logs (incoming & outgoing), contact list and/or phonebook information, Short message services (SMS) – including deleted messages, and Multi-media Services (MMS)."   The search warrant further indicated that the information in the above categories would be located within the overall category of "all user generated data stored on the handset and/or SIM card." Read in context, this statement is best understood as a forthright acknowledgement to the

magistrate that the warrant would be executed in the standard manner for search warrants of digital devices – through extraction of all of the information on the phone, and the subsequent search of that information for the specific and detailed items subsequently enumerated.   At most, the inclusion of the "all user generated data" language in the "items to be searched for and seized" portion of the warrant form, as opposed to the "premises to be searched" portion, constituted a minor good-faith oversight on the part of the applicant for the warrant – not a reason for the drastic sanction of exclusion.   See United States v. Russian, 848 F.3d 1239, 1246-48 (10th Cir. 2017) (finding that although warrant for search of cell phone was unconstitutionally general, evidence was nevertheless admissible pursuant to good-faith exception to warrant requirement); United States v. Taylor, 163 F. Supp. 3d 816, 820 (D. Ore. 2016) (holding that "the officers here acted in good faith in executing the search of Defendant's cell phone, despite the lack of protocols to limit the search").

### E.   The Court Should Deny the Defendants' Joint Motion to Suppress Identifications

The defendants have filed a joint motion requesting suppression of evidence that various witnesses in the investigation identified one or both of them in photographs, and further requesting that the witnesses be prohibited at trial from identifying them in the courtroom if the earlier identifications stemmed from a single-photograph display [DE 44].   The motion is baseless and should be denied.

While the defendants correctly cite the rule that "[a]n identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process," United States v. Brownlee, 454 F.3d 131, 137 (3d Cir. 2006) (emphasis added) (citing Manson v. Braithwaite, 432 U.S. 98, 107 (1977)), they incorrectly suggest that "single-photograph

displays" are necessarily "unduly suggestive and le[a]d to . . . unreliable identifications" that must

be suppressed.   DE 44 at 4.   The Supreme Court long ago squarely rejected that position:   "The

'admission of evidence of a showup without more does not violate due process.'"   Brathwaite,

432 U.S. at 106 (quoting Neil v. Biggers, 409 U.S. 188, 198 (1972)).   Rather, "reliability is the

linchpin in determining the admissibility of identification testimony."   Id. at 114; accord id. at

106 ("[Even] a suggestive and unnecessary identification procedure does not violate due process

so long as the identification possesses sufficient aspects of reliability.").   In assessing the

reliability of an identification, "the totality of the circumstances" are to be considered, including

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree

of attention, the accuracy of the witness' prior description of the criminal, the level of certainty

demonstrated by the witness at the confrontation, and the length of time between the crime and the

confrontation."   Id. (citing Biggers, 409 U.S. at 199-200).[11]

Indeed, the Supreme Court, the Third Circuit, and this Court have repeatedly found reliable,

and thus not subject to suppression, identifications involving a live showup or photograph of only

the defendant.   See, e.g., Brathwaite, 432 U.S. at 114-16; Biggers, 409 U.S. at 200-01 (showup of

only the defendant in a rape case was suggestive but permissible considering, inter alia, the length

of time the victim spent with the defendant while she was being assaulted, the adequate lighting,

and their physical proximity); Gov't of Virgin Islands v. Petersen, 553 F.2d 324, 326-28 (3rd Cir.

---

[11] The defendants' motion does not identify which witnesses' identifications they are challenging, and it is unclear whether any such identifications were actually pursuant to single photographs.   For example, one of the FBI agents involved in various witness interviews has reported that his general practice was to show photographs of various individuals who might be involved in the sex-trafficking conspiracy and ask the witness whether and how (s)he knew the person depicted; generally, only positive identifications were noted in the reports.   The Government thus assumes for purposes of the instant response that single photographs were shown, without waiving its right to offer evidence to the contrary should that be deemed necessary.

1977) (affirming admissibility of identifications by bartender and bar owner who had seen the defendant from a few feet away for a period of 30 minutes around the time of a fight and subsequent murder outside a bar); United States v. Waxman, 572 F. Supp. 1136, 1140-42 (E.D. Pa. 1983) (denying motion to suppress identifications by art gallery employees of defendant as art thief, despite the "unnecessary and suggestive" use of a "single photo identification procedure," where the witnesses had "possessed a good opportunity to see" the thief and were confident in their identifications).

Moreover, courts—including the Third Circuit—have repeatedly recognized that concerns with suggestiveness and reliability when a defendant is previously unknown to the witness are markedly less when the defendant was not a stranger to the witness.   See, e.g., Burgos-Cintron v. Nyekan, 510 F. App'x 157, 160-61 (3d Cir. 2013) (explaining that the "possible unfair suggestive aspects" of photo identifications are "immaterial" in a situation where, as there, the witness "previously had identified a particular individual as the perpetrator of an offense and he [wa]s shown a single photograph merely to confirm his earlier identification").   In Smith v. Overmyer, No. 16-civ-4762, 2018 WL 3097450 (E.D. Pa. Jan. 29, 2018), for instance, "the police's reliance on a single photograph to confirm [the defendant's] identity with [the witness] was not unduly suggestive."   Id. at *9.   "In his statement, [the witness] identified the shooter first by name, Quawi, and as someone with whom he grew up in the same neighborhood. . . . [T]he police then supplied a single photo to confirm, for the police's sake, the identity of the shooter."   Id. "When viewing [the witness's] out-of-court identification under the totality of the circumstances, a single-photo could not have been 'so impermissibly suggestive as to give ri[se] to a very substantial likelihood of irreparable misidentification' since [the witness] had already made a positive

identification of [the defendant] by name, before the detective showed him any photograph." Id. (citing, inter alia, Burgos-Cintron, 510 F. App'x at 161); see also Moore v. City of Lancaster, No. 17-civ-19, 2018 WL 3585134, at *9-10 (E.D. Pa. July 26, 2018) (holding it was "not impermissible for the detectives to show [a minor victim of repeated sexual offenses by the defendant] a single photo of [the defendant]," when she had had "several opportunities to observe the person with whom she had sexual activity, mainly in intimate settings").

In the case at hand, the victims and nearly all other eyewitnesses to the defendants' crimes knew the defendants personally before they were asked to identify them. Even if there was not such prior familiarity, the witnesses had sufficient opportunity to accurately see the defendants. It is therefore exceedingly unlikely that a single photograph display—if one even occurred—would result in misidentification. Under the totality of the circumstances, the identifications of the defendants by the various victims and witnesses in this case are reliable and admissible.

### F.    *The Court Should Deny the Defendants' Motions for Severance*

Bridges and Jones have each filed motions seeking severance [DE 48, 50]. They are unpersuasive. As the Supreme Court has repeatedly noted in addressing motions for severance, "joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability." Richardson v. Marsh, 481 U.S. 200, 210 (1987); accord Zafiro v. United States, 506 U.S. 534, 539 (1993). Thus, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

about guilt or innocence." <u>Zafiro</u>, 506 U.S. at 539.[12]   The defendant's burden of showing prejudice is a heavy one, because "[a] claim of improper joinder under Fed. R. Crim. P. 14 must demonstrate 'clear and substantial prejudice.'"   <u>United States v. Gorecki</u>, 813 F.2d 40, 43 (3d Cir. 1987) (<u>quoting</u> <u>United States v. Sebetich</u>, 776 F.2d 412, 427 (3d Cir. 1985)); <u>see also</u> <u>United States v. Eufrasio</u>, 935 F.2d 553, 568 (3d Cir. 1991) ("The Rule places the burden of proving prejudice from the joinder on the defendant seeking severance.").   While the defendants' motions cite different grounds for the requested severance, each defendant has failed to establish such a risk, and severance is therefore inappropriate.

     *1.   Jones' Motion for Severance Is Unpersuasive.*

Jones' motion suggests that a joint trial of Bridges and Jones would unfairly prejudice his defense.   It is well established, however, that defendants jointly indicted will be jointly tried, <u>see</u> <u>United States v. Sandini</u>, 888 F.2d 300, 305 (3d Cir. 1989), unless failure to sever would "clearly and substantially prejudice [a defendant] to the point of depriving him of a fair trial."   <u>United States v. Dickens</u>, 695 F.2d 765, 778 (3d Cir. 1982).   To demonstrate prejudice, a defendant seeking severance must show more than that separate trials might afford him a better chance of acquittal.   <u>Zafiro</u>, 506 U.S. at 540.   Rather, a defendant must show that denial of the severance motion would cause such substantial prejudice that he would be unable to obtain a fair trial. <u>Dickens</u>, 695 F.2d at 778; <u>accord</u> <u>United States v. Frumento</u>, 405 F. Supp. 23, 31 (E.D. Pa. 1975).

---

[12] Rule 14 provides that a district court "<u>may</u> . . . sever the defendants' trials" only "[i]f the joinder of . . . defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant."  Fed. R. Crim. P. Rule 14(a) (emphasis added).

Jones has failed to meet his heavy burden.   First, his conclusory and speculative claim that his and Bridges' defenses "may be" "mutually antagonistic," DE 50 at 5, is a far cry from the "serious risk" and "clear and substantial showing" of prejudice that is required before a case may be severed.   See Zafiro, 506 U.S. at 540 (rejecting defendants' general contention that severance was required "when two defendants both claim they are innocent and each accuses the other of the crime"); Sandini, 88 F.2d at 306 (noting no ground for severance when defendant "asserted in a totally conclusory fashion that his defense would be 'truly antagonistic' to . . . and 'mutually exclusive'" of his co-defendant's).

Second, Jones' conclusion that there is a "substantial disparity" in the evidence against each of the defendants, such that there may be a "spill-over effect" causing prejudice, DE 50 at 6-7, is ill-founded.   As an initial matter, "[n]either a disparity in evidence nor the introduction of evidence more damaging to one defendant than another entitles the seemingly less culpable defendant to severance."   Sebetich, 776 F.2d at 427 (citation omitted); accord Eufrasio, 935 F.2d at 568.   In any event, while Jones claims there is "no indication in the discovery that Mr. Jones engaged in" the "beatings and other violence, threats, and carrying firearms" that Bridges personally perpetrated, id. at 7, the evidence shows, among other things, that Jones was aware of Bridges' tactics, aided and abetted Bridges, and conspired with Bridges to commit sex trafficking, including of minors and by force.   See generally Indictment (DE at 1, 5-7).   Such evidence would thus be admissible even in a separate trial against Jones, and is not a reason for severance.   See Zafiro, 504 U.S. at 540; Eufrasio, 935 F.2d at 569.   Moreover, Jones' assertion that "Bridges is charged with additional sex trafficking counts . . . alleging the trafficking of a minor victim with no alleged connection to Mr. Jones," DE 50 at 7, is incorrect:   Among other connections, Jones

was present in the motel room during the recovery of the two minor victims who are the respective subjects of Counts 5 and 6, and has been connected to the minor victim who is the subject of Count 4 by (among other things) surveillance footage at one of the hotels and Jones' own statements in jail calls.

Third, there is no reason to believe that the jury will be unable to "compartmentalize" the evidence and charges against each defendant, DE 50 at 7-8, particularly if the Court gives limiting instructions where appropriate.   See, e.g., United States v. De Peri, 778 F.2d 963, 984-85 (3d Cir. 1985) (affirming denial of severance, noting "the evidence was presented in a clear fashion and . . . the court carefully instructed the jury as to the manner in which the evidence could be considered").   It will be abundantly clear to the jury that each defendant had a separate and distinct role in the sex trafficking organization, that each was involved in specific acts alleged by the Government, and that defendant Jones is not charged as to victims Z.W. and J.S—facts which can be further explored on cross examination as defense counsel deems warranted.   See also Eufrasio, 935 F.2d at 568 ("Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant.").

In addition, the need for judicial economy weighs strongly in favor of a joint trial.   The case against each of the defendants will involve at least three of the same minor victims, numerous law enforcement witnesses, and exhibits applicable to both defendants.   Requiring these victims to testify twice, in addition to the duplication of time that would be required of the other witnesses and court staff (plus the need for additional jurors), further counsels against severance.   See, e.g., Richardson, 481 U.S. at 210; Eufrasio, 935 F.2d at 568 ("The public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants

charged with a single conspiracy."). <u>See generally</u> 18 U.S.C. § 3771(a) (enumerating crime victims' rights); 18 U.S.C. § 3509(j) (seeking to "minimize the length of time the child must endure the stress of involvement with the criminal process"). Jones' motion to sever should be denied.

　　　2. *Bridges' Motion for Severance Is Likewise Unpersuasive.*

　　　Bridges' motion argues that he is entitled to a severance because the admission of certain evidence against Jones in a joint trial would violate his Confrontation Clause rights, DE 48 at 3, but that claim stems from a fatally flawed premise: that any statements of Jones that the Government might introduce at trial would be <u>testimonial</u> and thus trigger his Sixth Amendment right. The statements by Jones that Bridges flags for concern are statements Jones made (a) to his victim N.G. during the commission of the crime, and (b) in jail calls to various individuals. <u>Id.</u> at 3-4. None of these statements were made to law enforcement or intended to be used for purposes of prosecution. Thus, they do not implicate the Confrontation Clause or <u>Bruton v. United States</u>, 391 U.S. 123 (1968). <u>See, e.g.</u>, <u>United States v. Figueroa</u>, 729 F.3d 267, 275-276, 276 n.14 (3d Cir. 2013) (holding that district court properly admitted statement of co-conspirator in furtherance of the conspiracy, explaining that "[t]he protections of the Confrontation Clause and <u>Bruton</u> apply only to testimonial statements") (citing, <u>inter alia</u>, <u>Crawford v. Washington</u>, 541 U.S. 36 (2004)); <u>Crawford</u>, 541 U.S. at 51-52 (describing testimonial statements as those "made under circumstances, which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial").

　　　More generally, the Government is well aware of <u>Bruton</u> and its progeny, and does not intend to offer any testimonial statements that would implicate Bridges. A pretrial severance and

separate trials would thus be unnecessary and a waste of resources.  Bridges' motion to sever should be denied.

## II.  <u>CONCLUSION</u>

For the reasons given above, the Government respectfully submits that the defendants' pretrial motions to dismiss the indictment [DE 49, 54], for a bill of particulars [DE 43, 47], to suppress evidence [DE 55, 65], to suppress identifications [DE 44], and for a severance [DE 48, 50] should be denied.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

*/s/ Seth M. Schlessinger*
SETH M. SCHLESSINGER
Assistant United States Attorney
U.S. Attorney's Office
615 Chestnut Street
Philadelphia, PA 19106

JESSICA L. URBAN
Trial Attorney
Child Exploitation and Obscenity Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on the date listed below, I filed a copy of the foregoing document with the Clerk of Court, and served a copy upon all counsel of record, via CM/ECF.

*s/Seth M. Schlessinger*
SETH M. SCHLESSINGER
Assistant United States Attorney

Date:      November 2, 2018